## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| TODD PEARSON, MARK PEARSON, and ANDREW RICK, | Civil No. 08-1370 (JRT/FLN) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF BIG LAKE, Minnesota; SEAN RIFENBERICK, in his individual and official capacity; and SCOTT JOHNSON, in his individual and official capacity, | |
| Defendants. | |

Benjamin Elwood and Lawrence Schaefer, **SCHAEFER LAW FIRM, LLC**, 220 South 6th Street, Suite 1700, Minneapolis, MN 55402-4511, for plaintiffs.

Julie Fleming-Wolfe, **FLEMING-WOLFE LAW OFFICE**, 1922 Grand Avenue, St. Paul, MN 55105, for defendants.

Plaintiffs Todd Pearson, Mark Pearson, and Andrew Rick (collectively, "plaintiffs"), were officers in the City of Big Lake (Minnesota) Police Department, and they brought this action against the City of Big Lake, Big Lake Chief of Police Sean Rifenberick, and Big Lake City Administrator Scott Johnson (collectively, "defendants"). Plaintiffs allege that they suffered adverse employment actions as a result of their cooperation with an internal investigation relating to Chief Rifenberick. Defendants filed

a motion for summary judgment on all counts.  (Docket No. 23.)  For the reasons stated

below, the Court grants the motion in part and denies the motion in part.

## BACKGROUND[1]

This suit arises out of a tumultuous period at the Big Lake Police Department (the

"Department").  During that period, the City of Big Lake (the "City") twice changed the

organizational structure of the Department and also hired an independent investigator to

look into a complaint brought by Officer Daniel Sherburne about Sean Rifenberick, the

Chief of Police.   Todd Pearson and Mark Pearson were directly involved in the

organizational changes, first being promoted to the supervisory position of Sergeant and

then effectively being demoted to patrol officers when the City eliminated the Sergeant

positions.   Mark Pearson raised concerns that Chief Rifenberick was not properly

administering a state grant, and his concerns were ultimately shared with the investigator.

Chief Rifenberick attempted to enlist the help of Andrew Rick in monitoring Officer

Sherburne and also attempted to shape the testimony of Andrew Rick and other officers.

Plaintiffs allege that they suffered adverse employment actions as a result of their

participation in the investigation, their reporting of suspected violations of the Fair Labor

Standards Act ("FLSA"), and their reporting of inappropriate emails that Chief

Rifenberick sent to the Pearsons.  Specifically, the Pearsons allege that the Sergeant

positions were eliminated as a result of their protected conduct, and Andrew Rick alleges

---

[1] The Court, as it must when considering a motion for summary judgment, views the facts and evidence in the record in the light most favorable to the plaintiffs, the non-moving party.  *Riley v. Lance*, 518 F.3d 996, 999 (8th Cir. 2008).

that he was terminated as a result of his protected conduct.  The Pearsons also allege that the elimination of the Sergeant positions violated due process, and that Chief Rifenberick has interfered with their efforts to obtain employment elsewhere by making defamatory statements about them.

### A.      Events Leading up to the Creation of the Sergeant Positions

Prior to August 2005, the Department had a "flat" structure, consisting of Chief Rifenberick and approximately eight rank-and-file officers.  In November 2002, the City hired Mark Pearson as a patrol officer.  (Rifenberick Dep. at 63-65, 84, Fleming-Wolfe Aff. Ex. 5, Docket No. 25.)  Approximately one year later, Andrew Rick began work with the Department as a volunteer reserve officer.  (Rick Dep. at 19, Elwood Aff. Ex. 1, Docket No. 30.)

On January 19, 2005, Chief Rifenberick completed the first and only performance evaluation that Mark Pearson received before he was promoted to Sergeant.  The evaluation stated that Mark Pearson's overall performance was "good," and that he was fully meeting the expectations of his job.  (Rifenberick Dep. at 92-99, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. Ex. 2, Elwood Aff. Ex. 6, Docket No. 32.)

In May 2005, the City hired Todd Pearson, Mark Pearson's twin brother.  Mark Pearson had recommended him for the position, and Chief Rifenberick specifically recommended that the City Council hire him.  (Rifenberick Dep. at 137-39, Fleming-Wolfe Aff. Ex. 5, Docket No. 25.)

In 2005, it was apparent that the City was growing and that the Department would also be growing.   Chief Rifenberick encouraged the City Council to establish an intermediate Sergeant position to assist with management, supervision, and other responsibilities.   The City Council created the Sergeant position, and on July 18, 2005, Chief Rifenberick recommended Mark Pearson for promotion to Sergeant.   (Rifenberick Dep. at 99-102, 129-31, Fleming-Wolfe Aff. Ex. 5, Docket No. 25.)   In recommending Mark Pearson, Chief Rifenberick stated that "Officer Pearson has met all of my requirements and has improved tremendously over the last year."   (Fleming-Wolfe Aff. Ex. 8, Docket No. 25.)   The City promoted Mark Pearson to Sergeant in August 2005. (*See* Rifenberick Dep. at 109-15, 122, Fleming-Wolfe Aff. Ex. 5, Docket No. 25.)

Also in August 2005, Officer Daniel Sherburne and several other officers went to Law Enforcement Labor Services (hereinafter the "union") and expressed concern that some of Chief Rifenberick's overtime and timecard practices violated state or federal law, including the FLSA.   The union subsequently met with Chief Rifenberick, who became upset about the allegations, and who suspected that Officer Sherburne had something to do with them.   (Johnson Dep. at 125-28, Elwood Aff. Ex. 5, Docket No. 31.)

On or about November 2, 2005, Chief Rifenberick completed a six-month review of Todd Pearson.   The review stated that Todd Pearson met or exceeded expectations for all criteria, and rated his overall performance as "exceeding expectations."   Chief Rifenberick closed the narrative portion of his written assessment by saying, "If chosen to become the next supervisor, I am certain that [Todd Pearson] would excel at the position

and become a more prominent leader within the agency." (Rifenberick Dep. at 153-55, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. Ex. 8, Elwood Aff. Ex. 6, Docket No. 33.)

Chief Rifenberick socialized with Rick and the Pearsons, and in January and February 2006, he sent the Pearsons three emails, two of which had "pornographic" images attached, and one of which included sexually explicit text. Mark Pearson testified that he was offended by the emails because they came from his boss. Todd Pearson testified that he believed that Chief Rifenberick reasonably thought that it was acceptable to send the emails because they were all close friends, but he also testified that he told Chief Rifenberick that he was offended by the email and that he was concerned about being disciplined if he were to open the attachments at work. The Pearsons showed at least one of the emails to Andrew Rick. (Rick Dep. at 242-43, 257-58, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; T. Pearson Dep. at 210-12, Fleming-Wolfe Aff. Ex. 2, Docket No. 25; Rifenberick Dep. at 85-87, Fleming-Wolfe Aff. Ex. 5, Docket No. 25.)

In February 2006, Andrew Rick went to Chief Rifenberick with some concerns about Officer Sherburne, one of the people who had previously expressed concerns about Chief Rifenberick's overtime and timecard practices. Chief Rifenberick ordered Rick to memorialize these concerns in writing and submit them to him. Chief Rifenberick was "continually" calling Rick about concerns that Sherburne and other licensed officers were "pushing negativity onto reserves." (Rifenberick Dep. at 281-84, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; *see also* Rick Dep. at 39-42, 81-82, Fleming-Wolfe Aff. Ex. 1, Docket No. 25.)

In early 2006, Chief Rifenberick encouraged the City Council to create a second Sergeant position, arguing that the position was justified by the growth in Big Lake's population and the growth in the size of the Department. Chief Rifenberick recommended Todd Pearson for the position, and he was promoted effective April 16, 2006. (Rifenberick Dep. at 140-42, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Fleming-Wolfe Aff. Ex. 9, Docket No. 25.)

### B. Rick's Promotion to Full-Time Patrol Officer and Events Leading up to the Shellum Investigation

Mark Pearson had assisted the Department in applying for and obtaining a "Safe 'n' Sober" grant from the State of Minnesota. His name was on the grant application, and he was responsible for its proper administration. (T. Pearson Dep. at 58-59, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.) In May 2006, he sent a letter to City Administrator Scott Johnson to express concerns about Chief Rifenberick, including his administration of grant payments. He also expressed concern about Chief Rifenberick's management and communication style. City Administrator Johnson responded by email, stating that he did not feel comfortable with Pearson's "end around" approach with Chief Rifenberick. Johnson refused to meet with Pearson without Chief Rifenberick present. Johnson did not view Pearson's concerns as a "complaint." Pearson responded to Johnson's email by expressing concern about retaliation from Chief Rifenberick. (Johnson Dep. at 86-89, 104-05 Fleming-Wolfe Aff. Ex. 6, Docket No. 25.)

Also in May 2006, Chief Rifenberick directed each officer in the Department to complete an anonymous survey about communication within the department and about

Chief Rifenberick's management and communication style.   Chief Rifenberick encouraged the officers to be honest in their responses and assured them that the survey was anonymous.   After the officers completed the surveys, Chief Rifenberick called the Pearsons into his office and enlisted them to assist in identifying the author of each survey response.   Chief Rifenberick told them that he could recognize the Pearsons' handwriting, and he did in fact correctly identify their surveys.   (M. Pearson Aff. ¶ 2, Docket No. 35; T. Pearson Aff. ¶ 2, Docket No. 36; *see also* Rifenberick Dep. Ex. 9, Elwood Aff. Ex. 6, Docket No. 33.)

Also in May 2006, Chief Rifenberick completed a "six-month" evaluation of Mark Pearson in his position as Sergeant.   He rated Pearson as exceeding expectations overall, but criticized his "obstinacy and attitude."   Chief Rifenberick wrote that Mark Pearson "needs to make an immediate, significant and marketable improvement in his attitude and approach to the job and citizens and in his ability to communicate with supervisor and staff and citizens.   If this does not improve, I will recommend to [the City] Council that Sergeant [Mark] Pearson's probationary period be extended."   Mark Pearson's probationary period was not extended, however, and he became a full Sergeant on or about August 7, 2006.   (Rifenberick Dep. at 131-32, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. Ex. 6, Elwood Aff. Ex. 6, Docket No. 32; Rifenberick Dep. Ex. 20, Elwood Aff. Ex. 6, Docket No. 33.)

In August 2006,[2] Mark Pearson went to Chief Rifenberick to discuss concerns about the administration of the Safe 'n' Sober grant.  Mark Pearson was concerned that Chief Rifenberick was violating the terms of the grant by requiring officers working under the grant to take compensatory time rather than earning overtime.  He was particularly concerned because his name was on the grant and he did not want to be held responsible for these alleged violations.  Mark Pearson contacted the state officer in charge of the grant, and that person confirmed his understanding of the grant requirements.  Mark Pearson forwarded the state officer's contact information to Chief Rifenberick, but Chief Rifenberick responded in an email stating, "Don't challenge me."  Chief Rifenberick also told Mark Pearson to mind his own business.  Mark Pearson then met with City Administrator Johnson to report his concerns.  He presented a form letter indicating that officers in the Department had complaints of violations of the FLSA as well as other concerns.  He asked Johnson to investigate, but Johnson stated that he would not do "end runs around department heads," including Chief Rifenberick.  (M. Pearson Dep. at 88-99, Elwood Aff. Ex. 4, Docket No. 30.)

At some point during Todd Pearson's time as Sergeant, Chief Rifenberick assigned him to be the reserve coordinator.  Todd Pearson thought that Chief Rifenberick was violating the FLSA by expecting Pearson to perform some of his reserve coordinator duties during his time off, and ultimately resigned from the reserve coordinator position

---

[2] It is unclear from the record whether the events described in this paragraph took place in August 2006, as Mark Pearson testified in his deposition, or whether they were part of the incidents that took place in November 2006, as described in greater detail below.  (*See* Plaintiffs' Mem. of Law in Opposition to Defendants' Motion for Summary Judgment at 6, Docket No. 27 (characterizing Mark Pearson's deposition testimony as describing events of November 2006).)

as a result of this issue.  (T. Pearson Dep. at 59-70, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.)

Andrew Rick was scheduled to take his peace officer examination at the end of 2006, and on October 30, 2006, Chief Rifenberick requested that the City Council authorize the Department to hire Rick on a part-time basis in the interim.  Chief Rifenberick stated that Rick had been a volunteer reserve officer in the Department "for some time and ha[d] performed exceptionally well in that capacity."  The City Council granted Chief Rifenberick's request.  (Rifenberick Dep. Ex. 44, Elwood Aff. Ex. 6, Docket No. 33; Fleming-Wolfe Aff. Ex. 12, Docket No. 25; *see also* Rick Dep. at 28-29, Elwood Aff. Ex. 1, Docket No. 30.)

On or about November 6, 2006, Chief Rifenberick completed a six-month performance evaluation of Todd Pearson in his probationary position as Sergeant.  Chief Rifenberick indicated that he was meeting or exceeding all expectations.  (Rifenberick Dep. Ex. 8, Elwood Aff. Ex. 6, Docket No. 33.)

On November 7, 2006, Mark Pearson again communicated with City Administrator Johnson about Chief Rifenberick.  Pearson sent Johnson a lengthy email describing his concerns about Chief Rifenberick's management style and about Chief Rifenberick's decision to use compensatory time rather than paid overtime for overtime shifts under the Safe 'n' Sober grant.  Johnson understood this email to include a complaint that Chief Rifenberick's overtime practices may violate the FLSA.  Pearson urged Johnson to keep the email "confidential for fear of retaliation from Chief Rifenberick."  Johnson replied the same day, stating that he "will not bypass Department

Heads when concerns are brought up regarding their management style/communication and I cannot promise to keep this information confidential."  Pearson's response stated, in part,

> [B]ased upon the information I have provided you regarding fear of retaliation, . . . any future reprisals that occur to me based upon information you pass along to Chief Rifenberick could possibly be considered "whistle-blower" retaliation.  I would urge you to consider that and do your best to keep my wishes for anonymity granted.

Johnson suggested that Pearson "sit down and talk to the Police Chief about [his] concerns as a member of the" Department.  Johnson considered Pearson's concerns to be of a sufficiently serious nature that he felt it was necessary to involve the City Attorney. He met with the City Attorney to review Pearson's complaint, and several weeks later the two of them met with Chief Rifenberick and went through the complaint, including Pearson's concerns about the Safe 'n' Sober grant and possible FLSA violations, but the City Council did not take any corrective action.  (Johnson Dep. at 105-13, 117-20, Elwood Aff. Ex. 5, Docket No. 31; *id.* Ex. 3.)

On November 20, 2006, Chief Rifenberick completed a "one-year" performance evaluation of Mark Pearson as Sergeant.  Chief Rifenberick indicated that he met or exceeded expectations in all categories.  (Rifenberick Dep. at 133-35, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. Ex. 7, Elwood Aff. Ex. 6, Docket No. 32.)

On December 21, 2006, soon after Andrew Rick passed the Minnesota Peace Officer Licensing Examination, Chief Rifenberick recommended that the City Council hire Rick as a full-time patrol officer, stating that Rick had been "performing exceptionally well" as a reservist.  At Chief Rifenberick's insistence, the City did not post

the vacancy and did not consider any other candidates for the position.   Apparently because of Chief Rifenberick's recommendation, the City never required Rick to test for the job.   City Administrator Johnson admitted that this hiring process was out of the ordinary.   (Johnson Dep. at 78, 83-85, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; Fleming-Wolfe Aff. Ex. 13, Docket No. 25; *see also* Rick Dep. at 28-29, Elwood Aff. Ex. 1, Docket No. 30.)

### C.   The Shellum Investigation

In February 2007, Officer Sherburne, through his lawyer, sent a letter to the mayor of Big Lake complaining of Chief Rifenberick's management practices and alleging that Chief Rifenberick's practice of requiring officers to prepare for their shifts fifteen to twenty minutes before they began, without pay, violated the FLSA.   On February 28, 2007, the City Council authorized the hiring of an independent investigator to look into Officer Sherburne's claims.   Richard Shellum of Midwest Government Advisors conducted the investigation.   The scope of Shellum's work included an investigation of alleged misconduct committed by Chief Rifenberick "and/or the supervisors."   City Administrator Johnson gave Shellum a copy of Mark Pearson's November 7, 2006, communications about Chief Rifenberick.   (Johnson Dep. at 113-14, Elwood Aff. Ex. 5, Docket No. 31; Johnson Dep. at 147-50, Fleming-Wolfe Aff. Ex. 6, Docket No. 25.)

On March 1, 2007, City Administrator Johnson sent a memorandum to Department staff announcing the investigation and emphasizing that "[a]ll personnel are to cooperate fully with all aspects of the investigation."   Johnson then directed Chief

Rifenberick to schedule appointments for each staff member to give testimony to Shellum.  Officers were concerned about the fact that Chief Rifenberick was scheduling the appointments because they perceived that he was the primary target of the investigation.  Officers also expressed concerns to the union that Chief Rifenberick was pressuring officers in an effort to shape their testimony and that he would retaliate against them for statements made to Shellum.  The union business agent expressed these concerns to City Administrator Johnson.  (Rifenberick Dep. Ex. 11, Elwood Aff. Ex. 6, Docket No. 33; Johnson Dep. at 133-34, Elwood Aff. Ex. 5, Docket No. 31; *see also* Rick Dep. at 92-93, Fleming-Wolfe Aff. Ex. 1, Docket No. 25.)

On March 7, 2007, Chief Rifenberick sent a memorandum to Department staff stating, in part, "you should not have to go through this," and "[i]t is unfortunate that the [Department] is in this position."  Chief Rifenberick conceded that he was upset by the investigation.  Chief Rifenberick did not know that Officer Sherburne had initiated the complaint that gave rise to the investigation.  (Rifenberick Dep. at 178-79, Elwood Aff. Ex. 6, Docket No. 32; Rifenberick Dep. Ex. 10, Elwood Aff. Ex. 6, Docket No. 33.)

Also on March 7, 2007, City Administrator Johnson responded to the concerns expressed by the union business agent by issuing a memorandum to Department staff stating, "I can assure you that no retaliation will be tolerated on the part of anyone involved."  (Johnson Dep. at 120-24, Elwood Aff. Ex. 5, Docket No. 31; Rifenberick Dep. Ex. 14, Elwood Aff. Ex. 6, Docket No. 33)

Officers reported that during the investigation, Chief Rifenberick was spending an unusual amount of time in the hallway outside the office where Shellum was conducting

interviews.   Officers expressed concern that Chief Rifenberick was communicating directly with Shellum about the substance of the interviews.  They also expressed concern that Chief Rifenberick's interactions with them became increasingly hostile as the investigation continued.   (M. Pearson Aff. ¶ 3, Docket No. 35; T. Pearson Aff. ¶ 4, Docket No. 36.)

Early in the investigation, Chief Rifenberick told Andrew Rick some of Officer Sherburne's allegations, conceding, "I'm not supposed to be telling you this so this does not leave this office."   Chief Rifenberick then directed Rick to monitor Officer Sherburne's MySpace webpage and to deliver downloads of that webpage to Chief Rifenberick.  Chief Rifenberick noted that Officer Sherburne's MySpace webpage had several derogatory comments, and asked Rick, "why is it okay for him to post these and I can't."  He instructed Rick to keep this monitoring secret.  He then ordered Rick "to go home and make copies of [Sherburne's] MySpace page on [Rick's] personal computer." Approximately one hour later, Chief Rifenberick delivered several CDs to Rick at his home and requested that Rick continue monitoring the MySpace page.   Rick did so reluctantly for a few days, but then refused to cooperate any further.  According to Rick, "all of a sudden [Chief Rifenberick's] attitude towards me changed. . . . I mean he was completely targeting me."  Rick also observed that Chief Rifenberick's relationship with the Pearsons "had gone downhill because of" the investigation, and that Chief Rifenberick was targeting all three of them. (Rick Dep. at 84-91, 193-96, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; *see also* Rifenberick Dep. at 294-95, Fleming-Wolfe Aff. Ex. 5, Docket No. 25.)

When Rick met with Shellum, Rick reported that Chief Rifenberick was a "master manipulator," but declined to go into further detail "because of the conversations I had had with Chief Rifenberick prior to this that if I did say anything that my job, kind of my job was in jeopardy.  I didn't feel safe that he wouldn't come after me if I did say anything."  (Rick Dep. at 95-97, Fleming-Wolfe Aff. Ex. 1, Docket No. 25.)

When Chief Rifenberick contacted Mark Pearson to schedule his interview, Chief Rifenberick asked him whether he planned to speak with Shellum.  Pearson stated that he would comply with City Administrator Johnson's directive and would cooperate with the investigation and tell the truth.  Chief Rifenberick responded, "That is unfortunate.  I thought we were friends."  After the interview, Chief Rifenberick "put a sudden stop to his previously cordial professional and social relations with both Todd and Mark Pearson, and maintained a cool and unfriendly demeanor toward them at and outside of work."  (M. Pearson Interrogatory Responses, Fleming-Wolfe Aff. Ex. 41 at 16, Docket No. 25.)

During his interview, Mark Pearson informed Shellum of the complaints he had raised in 2006, including allegations of FLSA and Safe 'n' Sober grant violations.  Pearson also informed Shellum of what Pearson believed to be sexually inappropriate comments from Chief Rifenberick.  (M. Pearson Dep. at 93, Elwood Aff. Ex. 4, Docket No. 30.)

Andrew Rick testified in his deposition that several officers were concerned that they might be harmed professionally for speaking with Shellum.  Rick also testified that on several occasions during the investigation Chief Rifenberick called several officers into his office for closed-door meetings.  During those meetings, Chief Rifenberick

attempted to shape the testimony of the officers by explaining that the investigation was politically motivated.  On one occasion, Chief Rifenberick told Rick and several other officers, "[Y]ou better not be saying bad things about me in this investigation."  Chief Rifenberick then attempted to coach their testimony by referencing certain incriminating incidents that the officers were familiar with and then saying, "[Y]ou don't remember me doing that, right?"  Rick believed that Chief Rifenberick was suggesting that there would be negative consequences if the officers provided testimony about those incidents.  Other officers informed Rick that they had similar experiences with Chief Rifenberick during the investigation.  (Rick Dep. at 93-97, 100-15, Fleming-Wolfe Aff. Ex. 1, Docket No. 25.)

On March 30, 2007, Chief Rifenberick called Rick into his office, shut the door, and warned him that any officers who talked about the investigation would be "dealt with."  He told Rick that he assumed that Rick would tell everything the two of them discussed to the Pearsons.  He cautioned Rick that Rick "was too involved in office politics," and reminded Rick that he "was on probation and just starting out," and that Rick "should be careful as to how involved in office politics" Rick was.  Chief Rifenberick further warned Rick to "be careful about what [he was] saying."  Rick interpreted these statements as a threat of retaliation "because of things [Rick] may have said to other people or to the investigator in regards to this investigation."  Rick "felt as though [Chief Rifenberick] was trying to drag [him] into talking about this investigation in further detail with [Chief Rifenberick]."

In describing the conversation to the union representative, Rick stated that he understood Chief Rifenberick's comments to mean that as a result of certain officers giving testimony about Chief Rifenberick's illegal or improper behavior, Chief Rifenberick was "now going after those individuals and singling them out making statements or promises as to what can happen to them if they don't obey exactly what he, the Chief, says."  Rick observed that his relationship with Chief Rifenberick had started to deteriorate at this point.  (Rifenberick Dep. Ex. 53, Elwood Aff. Ex. 6, Docket No. 33; Rick Dep. at 115-17, 193-96, 225-26, 255-56, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; Fleming-Wolfe Aff. Ex. 40 at 13-14, Docket No. 25.)

On several occasions during the investigation, Chief Rifenberick called Todd Pearson into his office to discuss the investigation.  Chief Rifenberick asked Pearson to describe what he had told Shellum.  When Pearson refused to do so, Chief Rifenberick became visibly upset.  After the investigation concluded, Chief Rifenberick told Pearson that their friendship was over.  (T. Pearson Aff. ¶ 3, Docket No. 36.)

On April 3, 2007, Chief Rifenberick directed Todd Pearson to complete a three-month evaluation of Andrew Rick for Chief Rifenberick's review.  (Fleming-Wolfe Aff. Ex. 13, Docket No. 25.)  It appears that such a review would have been unprecedented, because the earliest reviews for probationary employees occur after six months. (Rifenberick Dep. Exs. 45-46, Elwood Aff. Ex. 6, Docket No. 33.)  Todd Pearson's evaluation did not mention any performance problems or include any negative comments. Chief Rifenberick later added his own comments, indicating some performance problems and documenting other negative issues.  (Rifenberick Dep. at 284-86, Fleming-Wolfe

Aff. Ex. 5, Docket No. 25; *see also* Rick Dep. at 30-32, 128-52, Elwood Aff. Ex. 1, Docket No. 30; Rick Dep. at 205-08, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; Fleming-Wolfe Aff. Ex. 40 at 14.)

On April 4, 2007, Andrew Rick sent a letter to the union business agent, complaining that Chief Rifenberick had ordered the early performance review as retaliation for Rick's involvement in the investigation.  Rick stated that several officers had told him that "over the last several days . . . the Chief is making certain comments about things that are going on in the department and when he would say them he would point to [Rick's] desk or if [Rick] was in the building he would look over at [Rick] to make that person understand who he was talking about."  Rick felt that "the only reason this review was brought up was because of [Rick's] previous meeting with the Chief" on March 30.  (Rifenberick Dep. Ex. 47, Elwood Aff. Ex. 6, Docket No. 33; Rick Dep. at 193-96, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; *see also* Rick Dep. at 30-32, 128-29, Elwood Aff. Ex. 1, Docket No. 30.)

On April 6, 2007, the union business agent wrote a second letter to Shellum to express the union's continuing "serious concerns" about the Shellum investigation.  The letter stated that the union "is collecting many instances of reprisals and retaliatory actions taken against officers for their participation in the investigation."  It urged Shellum to investigate these allegations, concluding that "[t]he Union strongly believes the Chief's actions continue to harass and intimidate officers in a manner to discourage a thorough investigation."  The mayor was copied on the letter, and it was eventually forwarded to City Administrator Johnson, who discussed it with Shellum.  (Johnson Dep.

at 154-57, Elwood Aff. Ex. 5, Docket No. 31; Rifenberick Dep. Ex. 12, Elwood Aff.
Ex. 6, Docket No. 33.)

During the investigation, some residents of Big Lake asked Andrew Rick about
the investigation, but Rick stated that he could not discuss confidential police business.
Rick testified in his deposition that he never told residents anything of substance about
the investigation.  (Rick Dep. at 35-37, Fleming-Wolfe Aff. Ex. 1, Docket No. 25.)

On April 9, 2007, at the request of Chief Rifenberick, City Administrator Johnson
wrote a memorandum to the City Council stating that "Staff is asking that you authorize
the extension of the probationary period for Sergeant Todd Pearson by six months . . .
due to the fact that Sgt. Pearson is new to supervising employees."  (Fleming-Wolfe Aff.
Ex. 14, Docket No. 25; Rifenberick Dep. at 81-83, Fleming-Wolfe Aff. Ex. 5, Docket No.
25.)

### D.    The City's Consideration of the Shellum Report

On April 10, 2007, Shellum delivered his report to the City.   His cover
memorandum stated, "We know the chief spoke to officers before and after their
interviews, and we are hopeful those conversations didn't influence the investigation."
The report noted that "the Chief had phoned one or more officers, often many times,
during the investigation.  He reportedly told one or more of the officers that if any of the
allegations that were put forth were found to be untrue, there would be serious
repercussions."  Shellum's report confirmed some of the FLSA allegations, stating that
"it is not appropriate to expect [officers] to prepare their vehicle and begin work without

compensation."   It also stated that there was "significant evidence" supporting the allegations that Chief Rifenberick denied officers "overtime if they work[ed] late to answer calls or prepare paperwork."   The report also made recommendations about the Pearsons.    It recommended "closer supervision and direction of the sergeants. Expectations should include a broader scope of supervisory vision, including assistance to officers, positive reinforcement as well as negative, a proper use of supervisory notes, and more discretion in their words and actions toward officers."  (Johnson Dep. at 162-64, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; Rifenberick Dep. Exs. 15-16, Elwood Aff. Ex. 6, Docket No. 33.)

Also on April 10, the City's Personnel Committee met to discuss two items.  First, it reviewed Shellum's report and recommended that it be forwarded to the City Council for comment at its meeting the next day.   Second, it considered Chief Rifenberick's request to extend Todd Pearson's probationary period.  (Johnson Dep. at 163-65, 177-79, Fleming-Wolfe Aff. Ex. 6, Docket No. 25.)   The Personnel Committee was in favor of the request and voted to pass it along to the City Council.  (Fleming-Wolfe Aff. Ex. 44, Docket No. 25.)  But after the meeting, the City Attorney and City Administrator Johnson met with Chief Rifenberick, and they learned that Chief Rifenberick had never communicated with Todd Pearson about a potential extension of the probationary period. Based on that discussion, the City Attorney recommended against the request, and it was not forwarded to the City Council.  (Johnson Dep. at 178-80, 187-88, Fleming-Wolfe Aff. Ex. 6, Docket No. 25.)  Todd Pearson's probationary period ended and he became a full

Sergeant effective April 16, 2007.  (*See* Rifenberick Dep. at 81-83, Fleming-Wolfe Aff. Ex. 5, Docket No. 25.)

Also on April 10, Todd Pearson telephoned City Administrator Johnson to express concern that Chief Rifenberick was retaliating against officers who had participated in the investigation.  Johnson then requested that the union business agent provide proof of retaliation to Shellum as soon as possible.  (Fleming-Wolfe Aff. Ex. 15, Docket No. 25; Johnson Dep. at 188-89, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; Rifenberick Dep. Ex. 13, Elwood Aff. Ex. 6, Docket No. 33.)

On April 11, 2007, the City Council met in a closed session and decided not to take any disciplinary action against Chief Rifenberick.  During this meeting, the City Council informed Chief Rifenberick of the content of Shellum's report.  (Rick Dep. at 237-38, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; Johnson Dep. at 166-75, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; *see also* T. Pearson Dep. at 90-92, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.)

> **E.     Events After the Conclusion of the Shellum Investigation, Including the Elimination of the Sergeant Positions and the Termination of Rick**

Andrew Rick reported that after the investigation, Chief Rifenberick and other officers became more rude, defensive, and critical of Rick and the Pearsons.  They referred to Rick as a "Traffic Nazi" and called him "Stripes," as if to suggest he was a third sergeant.  (Rick Dep. 117-19, 258-62, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; Fleming-Wolfe Aff. Ex. 40 at 14-15.)

On April 23, 2007, Chief Rifenberick issued a memorandum to the Pearsons.  It congratulated Todd Pearson on completing his probationary period.  It also emphasized that "[t]he investigation is over.  I am not talking about it and I do not expect anyone else should be either."  It also mentioned "some concerns with Andy [Rick] as it relates to his driving, gossiping and dealing with citizens that may warrant a coaching session." (Rifenberick Dep. at 214-19, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. Ex. 18, Elwood Aff. Ex. 6, Docket No. 33.)

On May 8, 2007, Chief Rifenberick sent another memorandum to the Pearsons. He expressed his "disappoint[ment] with how both of [them] ha[d] reacted to the recent Police Department investigation."  (Johnson Aff. Ex. 1, Docket No. 39-2; Rifenberick Dep. Ex. 19, Elwood Aff. Ex. 6, Docket No. 33.)  He testified in his deposition that he was disappointed with "how they approached the investigation and things that they were doing with staff, undermining my authority."  He also testified that he was disappointed with the Pearsons' failure to communicate with him, "failing to perhaps disclose information, share information, let me know what's going on."  He testified that he had been disappointed to learn that the Pearsons had instructed Rick not to have any contact with Chief Rifenberick during the investigation.  (Rifenberick Dep. at 220, 222-27, Elwood Aff. Ex. 6, Docket No. 32.)

On May 10, 2007, Chief Rifenberick held a Department meeting.  The minutes include the notation, "If you want to sue Chief, sue him and get it out of your system. Present all the information held for a year now and all the rest obtained.  How did that officer get information?"  The minutes also indicate that Chief Rifenberick expected the

Department to double in size over the next ten years.   (Rifenberick Dep. at 235-38,

Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. Ex. 23, Elwood Aff. Ex. 6,

Docket No. 33.)

Also on May 10, Chief Rifenberick held a "coaching" session with Andrew Rick.

On May 22, 2007, based on that coaching session, Chief Rifenberick completed a written

three-month performance evaluation of Andrew Rick.  The performance evaluation was

titled "Coaching."  A "Coaching" can lead to discipline and even termination, while a

performance review on its own cannot.   Chief Rifenberick's overall assessment was

"meets expectations," but it cautioned Rick to "eliminate gossiping.  It is occurring too

much.  Do not indulge in other[s'] negativity and drama.  If the Chief needs to know

something or you have information, contact me directly[.]"  Rick found it difficult to

comply with Chief Rifenberick's directive to avoid gossiping because Chief Rifenberick

repeatedly called Rick into his office and "continually ask[ed] [Rick] what other officers

[we]re saying about him, you know, are people still talking about the investigation that

had happened, basically attempting to get me back involved in it, which would include

obviously gossiping."  (Rifenberick Dep. Ex. 48, Elwood Aff. Ex. 6, Docket No. 33; Rick

Dep. at 33-34, 128-31, Fleming-Wolfe Aff. Ex. 1, Docket No. 25.)

On June 4, 2007, the union business agent brought several concerns to City

Administrator Johnson.  The four-page letter summarizing those concerns mentioned

Chief Rifenberick's management of the police officers and allegations of favoritism.  The

letter stated that Mark Pearson's "team believes they are being punished by being

required to work 9 months of weekends, whereas other teams do not have a similarly

harsh schedule." No other officers were mentioned by name. On or before July 6, 2007, City Administrator Johnson met with Chief Rifenberick and the City Attorney to go through all of the issues mentioned in the letter. (Johnson Dep. at 193-96, Elwood Aff. Ex. 5, Docket No. 31; *id.* Ex. 9.)

On June 27, 2007, City Administrator Johnson called a meeting of the Personnel Committee. Chief Rifenberick and the City Attorney also attended the meeting, even though they were not on the Committee. Relying entirely on information provided by Chief Rifenberick, the Committee concluded that "the structure [of the Department] was not working because of communication issues between the police chief and the sergeants and the sergeants and the officers." Chief Rifenberick supported eliminating the Sergeant positions "[b]ecause the position and the way it was structured wasn't working." He also had concerns about "[t]he communication between the Pearsons and [him]self and how they were approaching staff and their duties." He believed that "[t]he position wasn't being effective" because "of the manner in which the Pearsons were communicating their role in . . . those positions." The Committee adopted a recommendation to eliminate the two Sergeant positions. Initially the City Council was to discuss the recommendation on July 25, 2007, but because the Pearsons were on leave due to the death of their father, the discussion was postponed until August 8, 2007. (Fleming-Wolfe Aff. Ex. 20, Docket No. 25; Rifenberick Dep. at 238-45, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. Ex. 24, Elwood Aff. Ex. 6, Docket No. 33; Johnson Dep. at 207-13, Fleming-Wolfe Aff. Ex. 6, Docket No. 25.)

On July 3, 2007, Todd Pearson sent an email to City Administrator Johnson in an effort to initiate a complaint about the emails Chief Rifenberick had sent the Pearsons in early 2006.  Todd Pearson was aware of the Department's sexual harassment policy, which requires immediate reporting, (Fleming-Wolfe Aff. Ex. 39, Docket No. 25), but he explained that he did not report the emails earlier because he feared reprisals during his probationary period as Sergeant.  He requested a meeting later that day "to file two written formal complaints of misconduct" on behalf of himself and Mark Pearson. Johnson replied to the email, stating that he was not available at the time Pearson had suggested and offering a meeting time on July 11, 2007.  Johnson also asked, "Has Chief Rifenberick been made aware of these issues/complaints and has he been given an opportunity to respond to them per our Chain of Command?"  Pearson did not receive the reply email before the time Pearson had suggested for the meeting.  When Pearson arrived for the meeting, Johnson stated that he did not have time to meet, and that he did not want to receive a bunch of paperwork before the Independence Day holiday.  Johnson wrote a memo to the "City Hall Issues File" about the encounter, stating that Pearson showed "a lack of respect for the City and Johnson's time."  On July 5, 2007, Pearson replied to the email and agreed to meet on July 11.  (Fleming-Wolfe Aff., Exs. 21-23, Docket No. 25; Johnson Dep. at 198-200, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; T. Pearson Dep. at 120-24, 215-16, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.)

The Pearsons were unable to meet with City Administrator Johnson on July 11, however, because they were on leave due to the death of their father.  They presented their complaints to City Administrator Johnson on July 18, 2007.  The City Attorney then

initiated an independent investigation, which took place in July and August of 2007. (Johnson Dep. at 201-05, Fleming-Wolfe Aff. Ex. 6, Docket No. 25.)

On July 23, 2007, Officer Sherburne filed a civil complaint in the United States District Court, District of Minnesota, Docket No. 07-3503, alleging retaliation for reporting FLSA violations. The complaint originally named the Pearsons as additional defendants, but they were dropped from the suit in March 2008, and the City ultimately reached a settlement with Sherburne. (Rick Dep. at 239-40, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; T. Pearson Amended Interrogatory Responses, Fleming-Wolfe Aff. Ex. 41 at 12, Docket No. 25.)

On or about July 29, 2007, Chief Rifenberick emailed the Pearsons to complain about their presence in the office and use of the Department computer during their scheduled time off. He stated:

> If you are working in the office and you are off, I need to know why you are in the office and what you are working on. If you are off you need to be off and enjoy your time away from the office. I think ample time is provided for you to accomplish your job tasks during your scheduled time to work. I do not want to have an FLSA issue down the road where you indicate you worked and were not compensated for it. . . . I expect the extra computer usage beyond the scope of the normal scheduled shift will cease immediately.

Mark Pearson replied the same day, stating that many officers "routinely come into the office during their off-duty time and access various department computers to access email, review video to do reports from night before etc." He asked whether other officers were subject to the conditions set forth in Chief Rifenberick's email, and he asked Chief Rifenberick to identify the rules prohibiting the Pearsons from coming into the office on

off-duty time to do work-related activities. (Rifenberick Dep. Ex. 28, Elwood Aff. Ex. 6, Docket No. 33.)

On August 1, 2007, City Administrator Johnson informed the union of the City's intention to eliminate the Sergeant positions. That same day, the Pearsons filed a criminal complaint against Chief Rifenberick with the Sherburne County Sheriff, alleging sexual harassment and misconduct of a public official. (T. Pearson Dep. at 130-35, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.) Also that same day, Chief Rifenberick evaluated Andrew Rick's performance as between "meets" and "below" expectations. (Rifenberick Dep. Ex. 50, Elwood Aff. Ex. 6, Docket No. 33; Rick Dep. at 167-72, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; Rifenberick Dep. at 291, Elwood Aff. Ex. 6, Docket No. 32.) Rick, who was a probationary employee, did not receive any coaching or training to address any alleged performance deficiencies before he was terminated the following month. (Rick Dep. at 227-28, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; M. Pearson Interrogatory Responses, Fleming-Wolfe Aff. Ex. 42 at 16, Docket No. 25.)

On August 5, 2007, Mark Pearson submitted a complaint to Chief Rifenberick, City Administrator Johnson, and the Personnel Committee. In the complaint, Pearson requested that another officer be disciplined for conduct during a coaching session. Pearson alleged that Chief Rifenberick had violated Department policy by authorizing that officer to leave his duty post without Pearson's permission. (Johnson Dep. Ex. 14, Elwood Aff. Ex. 5, Docket No. 31.)

On August 6, 2007, Mark Pearson submitted a memorandum to "whom it may concern" detailing "acts of retaliation [that] have been done to me by Police Chief

Rifenberick since filing complaints against him for various acts of misconduct." He detailed several acts of retaliation: he was prohibited from using the Department's color printer, he was no longer a Safe 'n' Sober coordinator, he was no longer a Project Nightcap coordinator, he was removed from the City Safety Committee, he was ordered not to use Department computers while off-duty, and he was denied access to squad car videos. (Rifenberick Dep. Ex. 34, Elwood Aff. Ex. 6, Docket No. 33; *see also* T. Pearson Amended Interrogatory Responses, Fleming-Wolfe Aff. Ex. 41 at 19-21, Docket No. 25; T. Pearson Dep. at 246-59, 265-67, Fleming-Wolfe Aff. Ex. 2, Docket No. 25)

On August 6, 2007, the Personnel Committee met. The Committee discussed an investigation regarding the Pearsons' July 18 complaint and also discussed Officer Sherburne's civil complaint. (Johnson Dep. at 218-20, Fleming-Wolfe Aff. Ex. 6, Docket No. 25.)

On August 7, 2007, the union's business agent informed union members of the plan to eliminate the Sergeant positions. The Pearsons attended this meeting and were informed that the decision had nothing to do with their job performance. (Rick Dep. at 45-48, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; *see also* T. Pearson Dep. at 165-70, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.)

On August 8, 2007, the City Council met and adopted the recommendation to eliminate the Sergeant positions. Mark Pearson attended the meeting but did not speak on the issue. Todd Pearson does not believe that he attended. During the meeting, City Administrator Johnson told the City Council that the positions should be eliminated because there was a desire to restructure the Department. The proposal was not justified

based on performance or financial considerations.  At the meeting, the City Attorney inaccurately stated that the union was "in favor of the elimination of this position effective immediately."  The union subsequently insisted that the meeting minutes be changed to reflect the union's position, which was that the decision "is within the authority of management."  One member of the City Council found the proposal to be a "total surprise" and has testified that the City Attorney's representation of the union's position prompted him to vote in favor of the proposal.  He also testified that he did not believe that the elimination of the Sergeant positions improved the issues in the Department that existed prior to the restructuring.  (Johnson Dep. at 218-27, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; Johnson Dep. Ex. 13, Elwood Aff. Ex. 5, Docket No. 31; *see also* Rick Dep. at 48-50, Fleming-Wolfe Aff. Ex. 1, Docket No. 25; T. Pearson Dep. at 169-75, Fleming-Wolfe Aff. Ex. 2, Docket No. 25; Fleming-Wolfe Aff., Exs. 25-26; Backlund Dep. at 44-50, Fleming-Wolfe Aff. Ex. 7, Docket No. 25.)

The union never grieved or otherwise contested the decision to eliminate the Sergeant positions.  Todd Pearson has no recollection of whether he asked the union to take a position on the issue, but the Pearsons never grieved the elimination of the Sergeant positions.  The union business agent suggested that the Pearsons could file a lawsuit.  (T. Pearson Dep. at 159, 208-09, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.)

At approximately the same time that the City eliminated the Sergeant positions, the City and the union began discussions about creating an "Officer-in-Charge" position. Plaintiffs allege that this position would basically replicate the supervisory structure of

the Sergeant positions.  (T. Pearson Dep. at 170-71, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.)

On August 10, 2007, Chief Rifenberick wrote a memorandum to the Pearsons informing them of the decision to eliminate the Sergeant positions effective immediately. The memorandum directed the Pearsons to remove insignia from their uniforms and to return their pagers.  (Fleming-Wolfe Aff. Ex. 28, Docket No. 25.)

The Pearsons allege that after the Sergeant positions were eliminated, they faced various other adverse employment actions, including: being assigned to smaller desks; being denied access to squad car camera footage, the Driver Vehicle Services database, and the Department's color printer; restrictions on email access; limitations on access to the Department office during off-duty time; and a requirement that they not make any photocopies without first informing Chief Rifenberick of the purpose of the copies.  (*See, e.g.*, Rifenberick Dep. Ex. 34, Elwood Aff. Ex. 6, Docket No. 33.)

On September 5, 2007, the Personnel Committee received Chief Rifenberick's recommendation that Andrew Rick be terminated.  Rick, who was a probationary employee, had not received any coaching or training to address any alleged performance deficiencies raised in his August 1, 2007 performance review.  Chief Rifenberick explained that he "did not feel that Mr. Rick was working out as a probationary employee."  Chief Rifenberick recommended that Rick be terminated because of "[i]ssues such as communication [and] failure to follow direction," and also because Rick "was having a difficult time getting along with other staff and communicating with them, as well as myself, somewhat argumentative, perhaps a little overaggressive."  Chief

Rifenberick based his recommendation on his performance reviews of May 22, 2007, and August 1, 2007.  (Rifenberick Dep. at 277-80, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Rifenberick Dep. at 291-93, Elwood Aff. Ex. 6, Docket No. 32; Fleming-Wolfe Aff. Ex. 29, Docket No. 25.)

On September 11, 2007, the independent investigator assigned to look into the Pearsons' July 11 allegations about Chief Rifenberick's sexually explicit emails submitted his report to City Administrator Johnson.  The report stated that the investigator had interviewed Chief Rifenberick about the allegations.  (Johnson Dep. at 201-06, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; Fleming-Wolfe Aff. Ex. 30, Docket No. 25.)

Also on September 11, 2007, Chief Rifenberick reprimanded both Todd Pearson and Mark Pearson.  Chief Rifenberick gave Todd Pearson a written reprimand for insubordination for yelling at Chief Rifenberick during a telephone conversation.  Todd Pearson testified that he was speaking loudly because there was a bad connection and because he was driving quickly down the highway and had his window open.  Chief Rifenberick gave Mark Pearson a reprimand for insubordination for wearing Sergeant's stripes and for taking too long to change clothing.  (T. Pearson Dep. at 180-83, Fleming-Wolfe Aff. Ex. 2, Docket No. 25; M. Pearson Dep. at 74-75, Fleming-Wolfe Aff. Ex. 4, Docket No. 25.)

On September 12, 2007, the Personnel Committee met.  Chief Rifenberick attended the part of the meeting in which the Committee decided to support Chief Rifenberick's recommendation to terminate Andrew Rick.  After Chief Rifenberick left,

the Committee reviewed the investigator's report about the sexually explicit emails.  The Committee recommended that the City reprimand Chief Rifenberick in writing. (Fleming-Wolfe Aff. Ex. 31, Docket No. 25.)  The same day, the City Council approved both recommendations.  (Fleming-Wolfe Aff., Exs. 32-34, Docket No. 25; Rifenberick Dep. Ex. 52, Elwood Aff. Ex. 6, Docket No. 33; Johnson Dep. at 245-49, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; Johnson Dep. Ex. 19, Elwood Aff. Ex. 5, Docket No. 31.)

On October 10, 2007, Chief Rifenberick sent City Administrator Johnson an email expressing what he perceived to be a need to conduct an investigation or ask some questions "before [the Pearsons] initiate a lawsuit."  He asked, "How will it look if we take action later after they make additional accusations?"  (Rifenberick Dep. Ex. 39, Elwood Aff. Ex. 6, Docket No. 33; Rifenberick Dep. at 270-71, Fleming-Wolfe Aff. Ex. 5, Docket No. 25; Johnson Dep. at 235, Elwood Aff. Ex. 5, Docket No. 31.)

On December 3, 2007, a background investigator from the Blaine police department met with Chief Rifenberick to gather information about Todd Pearson, who had applied for employment with the Blaine police department.  The investigator's report noted that Chief Rifenberick "was very evasive when he was asked questions about [Todd Pearson] and seemed unwilling to release information or offer his opinions." Some of the investigator's questions pertained to Mark Pearson.  The investigator "asked several questions about the restructuring of the department eliminating Sgt's and asking [Chief Rifenberick] about specific incidents the applicant disclosed, [but] Rifenberick refused to answer questions[.]"  (T. Pearson Aff. Ex. A, Docket No. 36; T. Pearson Amended Interrogatory Responses, Fleming-Wolfe Aff. Ex. 41 at 11, 21, Docket No. 25;

M. Pearson Interrogatory Responses, Fleming-Wolfe Aff. Ex. 42 at 8, 19, Docket No. 25.)

At some point, Chief Rifenberick allegedly made disparaging remarks about the Pearsons' professionalism to the Chiefs of Police in Becker and Elk River, Minnesota. Chief Rifenberick allegedly told the Becker Police Chief that all of Chief Rifenberick's problems have to do with the Pearsons. He allegedly told the Elk River Police Chief that Mark Pearson had "personality conflicts." (M. Pearson Interrogatory Responses, Fleming-Wolfe Aff. Ex. 42 at 19, Docket No. 25; T. Pearson Dep. at 231-32, Fleming-Wolfe Aff. Ex. 2, Docket No. 25; M. Pearson Dep. at 128-31, Fleming-Wolfe Aff. Ex. 4, Docket No. 25.)

On February 13, 2008, the City hired an independent investigator to investigate a letter to the editor of a local newspaper for possible disciplinary action. In October 2007, a local newspaper had published a letter to the editor titled, "Chief Rifenberick's Desperate and Cowardly Acts." Although the letter was purportedly signed by a former law enforcement official, the Department suspected that it came from Mark Pearson. (*See* Johnson Dep. Ex. 15, Elwood Aff. Ex. 5, Docket No. 31; Fleming-Wolfe Aff. Ex. 37 (documents filed under seal).) The City placed Mark Pearson on paid administrative leave effective February 15, 2008. On April 7, 2008, the investigator submitted a report concluding that Mark Pearson sent the letter to the newspaper. The investigator also looked into allegations that the Pearsons and other officers had engaged in unauthorized use of the Driver Vehicle Services ("DVS") database. (T. Pearson Dep. at 139-41, Fleming-Wolfe Aff. Ex. 2, Docket No. 25; M. Pearson Dep. at 36-40, Fleming-Wolfe

Aff. Ex. 4, Docket No. 25; Johnson Dep. at 238-45, Fleming-Wolfe Aff. Ex. 6, Docket No. 25; Johnson Dep. Ex. 15, Elwood Aff. Ex. 5, Docket No. 31.)

After the investigation, Chief Rifenberick and City Administrator Johnson recommended that the City terminate Mark Pearson and give Todd Pearson a three-day suspension. The Personnel Committee accepted the recommendations. The Pearsons grieved the discipline, and Todd Pearson's grievance is still pending. (T. Pearson Dep. at 140-41, Fleming-Wolfe Aff. Ex. 2, Docket No. 25.) Mark Pearson elected not to pursue arbitration of his grievance and resigned in August 2008. (M. Pearson Dep. at 36-40, Fleming-Wolfe Aff. Ex. 4, Docket No. 25.)

On May 19, 2008, Todd Pearson, Mark Pearson, and Andrew Rick filed this action against the City of Big Lake, City Administrator Johnson, and Chief Rifenberick. The amended complaint alleges seven causes of action: Violation of the Minnesota Whistleblower Act (all plaintiffs), Deprivation of Property Interest Without Due Process (Todd Pearson and Mark Pearson), Deprivation of Free Speech (Todd Pearson and Mark Pearson), Deprivation of Free Speech and Free Association (Andrew Rick), Violation of the Fair Labor Standards Act (all plaintiffs), Defamation (Todd Pearson and Mark Pearson), and Tortious Interference with Business Relations (Todd Pearson and Mark Pearson). (Plaintiffs' Consolidated Complaint, Docket No. 17, ¶¶ 140-92.) On June 1, 2009, defendants filed a motion for summary judgment on all claims.

## ANALYSIS

### I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.     WHISTLEBLOWER CLAIMS

Plaintiffs allege that they faced retaliation prohibited under the FLSA and under the Minnesota Whistleblower Act.

#### A.      FLSA (Count 5)

Plaintiffs allege that Chief Rifenberick and the City violated 29 U.S.C. § 215(a)(3) by retaliating against them for their testimony in the Shellum investigation.  Section 215(a)(3) makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . or has testified in any . . . proceeding [under or related to the FLSA]."  "Consistent with its

remedial purpose, [Section 215(a)(3)] has been liberally construed." *Saffels v. Rice*, 40 F.3d 1546, 1548 (8th Cir. 1994).

The Court applies the *McDonnell Douglas* burden-shifting framework to the FLSA retaliation claims.[3] "To establish a prima facie case of retaliation, [plaintiff must] show that he participated in a statutorily protected activity, that [defendants] took an adverse employment action against him, and that there was a causal connection between them." *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034-35 (8th Cir. 2005). Then, if defendants articulate legitimate, non-retaliatory reasons for the adverse employment action, the plaintiff must show that those reasons "were not the true reasons for [the action], but merely a pretext for retaliation." *Id.* at 1035. The Court concludes that there are genuine issues of material fact at each step of the burden-shifting framework, and therefore defendants are not entitled to summary judgment on the FLSA retaliation claim.

First, defendants do not dispute, for purposes of summary judgment, that a reasonable jury could conclude that plaintiffs participated in a statutorily protected activity. (Mem. in Support of Defendants' Motion for Summary Judgment at 35-37, Docket No. 24.) A reasonable jury could conclude that Mark Pearson filed at least one complaint related to the FLSA. In May 2006, he sent a letter to Chief Rifenberick's

---

[3] Plaintiffs assume that the *Price Waterhouse* mixed-motives framework is applicable to FLSA retaliation claims where the plaintiff offers direct evidence of retaliatory motive. In light of *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2349-52 (2009), this assumption is likely untenable. Regardless, plaintiffs have failed to come forward with direct evidence of causation. Instead, they present general "direct evidence of retaliatory motive," which would not be sufficient to trigger *Price Waterhouse*. *See Conner v. Schnuck Mkts., Inc.*, 906 F. Supp. 606, 612 (D. Kan. 1995) (discussing the distinction between direct evidence of discriminatory animus and direct evidence of causation).

supervisor, City Administrator Johnson, expressing concerns about Chief Rifenberick's administration of grant payments.  Several months later, he confronted Chief Rifenberick about his concerns, and again went to City Administrator Johnson.  Pearson was concerned in part that Chief Rifenberick's decision to use compensatory time rather than overtime for officers working under the Safe 'n' Sober grant violated the rules for the grant and violated the FLSA.  City Administrator Johnson understood Pearson's concerns to implicate the FLSA.  A reasonable jury could also conclude that all three plaintiffs testified in a proceeding related to the FLSA.  All three plaintiffs gave testimony to Shellum, and the Shellum investigation related in part to allegations that Chief Rifenberick was violating the FLSA.

Second, the City does not dispute, for purposes of summary judgment, that a reasonable jury could conclude that the City engaged in adverse employment actions against plaintiffs.  (Mem. in Support of Defendants' Motion for Summary Judgment at 24-25 & n.5, 35-37, Docket No. 24.)  In particular, the City eliminated the Sergeant positions, both of which were held by the Pearsons, and terminated Andrew Rick.

Third, a reasonable jury could conclude that there was a causal connection between the protected activities and the adverse employment actions.  The City argues that there are two flaws with plaintiffs' causation argument.  First, the City argues that the significant temporal lag between the protected activity and the adverse employment action undermines causation.  Second, the City argues that other employees who engaged in similar protected activity did not suffer the same adverse employment actions, thereby demonstrating that there is no causal connection between protected activity and the

adverse employment actions.   (Mem. in Support of Defendants' Motion for Summary Judgment at 35-36, Docket No. 24.)  The Court addresses these arguments in turn.

A reasonable jury could conclude that there is a sufficient temporal connection between the protected activities and the adverse employment actions, particularly in light of the events that took place **between** the time of the protected activities and the adverse actions.  *Cf. Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006) ("[H]ere, . . . the presence of intervening events undermines any causal inference that a reasonable person might otherwise have drawn from temporal proximity[.]").  The evidence suggests that Chief Rifenberick responded to the Pearsons' protected activity with escalating but regular reprisals which culminated in the elimination of the Sergeant positions.  For example, in May 2006, soon after Mark Pearson raised concerns that Chief Rifenberick was violating the FLSA with regard to the Safe 'n' Sober grant, Chief Rifenberick gave Pearson a negative performance review and threatened to extend his probationary period as Sergeant.  Chief Rifenberick told Pearson to mind his own business and directed Pearson not to "challenge" him.  A reasonable jury could conclude that City Attorney Johnson facilitated this conduct by declining to intervene, even when Pearson expressed fear of retaliation.

A reasonable jury could conclude that the threats of retaliation escalated during the Shellum investigation.  Chief Rifenberick did not know who had come forward with the allegations giving rise to the Shellum investigation, but he did know that Mark Pearson and Daniel Sherburne had previously raised complaints similar to those at issue in the Shellum investigation.  Chief Rifenberick's comment to Mark Pearson during the

investigation that it was unfortunate that Pearson intended to tell Shellum the truth and that Chief Rifenberick "thought [they] were friends" could lead a reasonable jury to conclude that Chief Rifenberick was threatening to retaliate against Pearson if Pearson did not shape his testimony in a way that would be favorable to Chief Rifenberick. Andrew Rick's testimony about Chief Rifenberick's closed-door meetings with officers during the investigation provides further evidence from which a reasonable jury could conclude that Chief Rifenberick was attempting to shape the testimony that officers gave Shellum.

Chief Rifenberick's conduct toward Todd Pearson during the investigation also suggests a causal connection between Todd Pearson's protected activity and the adverse employment actions.  During the investigation, Chief Rifenberick asked Todd Pearson what he had reported to Shellum and became visibly upset when Pearson refused to disclose that information.  Also during the investigation, Chief Rifenberick requested that the City extend Todd Pearson's probationary period as Sergeant.  Chief Rifenberick made this request even though there was no documentation of any prior communications with Pearson about the possibility of extending his probation.  The Personnel Committee considered that request at the same time it reviewed the results of the Shellum investigation.  After the investigation, Chief Rifenberick told Todd Pearson that their friendship was over.

Chief Rifenberick's conduct toward Andrew Rick during the investigation also suggests a causal connection between Rick's protected activity and his eventual termination.  Rick had previously assisted Chief Rifenberick in documenting Officer

Sherburne's questionable conduct.   During the investigation, Chief Rifenberick secretively attempted to enlist Rick to compile incriminating information about Officer Sherburne and other officers.   After Rick declined to continue this assistance, and still during the investigation, Chief Rifenberick cautioned Rick that he "was too involved in office politics" and warned him that he "was on probation and just starting out."   Within days of making this statement, Chief Rifenberick called for an unprecedented three-month performance review for Rick.   Chief Rifenberick took Todd Pearson's draft of the performance review and added several comments criticizing Rick's performance.   This performance review would ultimately form the basis for Chief Rifenberick's recommendation that the City Council terminate Rick.   Further, after the investigation concluded and Chief Rifenberick learned of the findings, Chief Rifenberick's conduct toward Rick became increasingly rude and critical.   Chief Rifenberick also wrote a memorandum to the Pearsons expressing his concern about Rick "gossiping."   Chief Rifenberick was also disappointed to learn that during the investigation the Pearsons had advised Rick not to have any contact with Chief Rifenberick.   A reasonable juror could conclude that Chief Rifenberick retaliated against Rick because he felt betrayed by Rick's refusal to assist with his efforts to shape the outcome of the investigation.

On May 8, 2007, less than one month after the City disclosed the findings of the Shellum investigation to Chief Rifenberick, Chief Rifenberick wrote a memorandum to the Pearsons stating that he was disappointed in how the Pearsons handled the investigation.   Chief Rifenberick explained that he was disappointed with the Pearsons' failure to communicate with him, "failing to perhaps disclose information, share

information, let me know what's going on."  A reasonable jury could conclude that the memorandum evidences Chief Rifenberick's growing hostility toward the Pearsons as a result of their participation in the Shellum investigation, as a result of their refusal to disclose the contents of their testimony, and as a result of Chief Rifenberick's conclusion that the Pearsons had not shaped their testimony in Chief Rifenberick's favor.

The adverse employment actions came soon after other actions by Chief Rifenberick that suggest he was seeking to find a means to retaliate against plaintiffs for their protected activities.  Even though more than two months passed between the date the City considered Shellum's report and the date the City decided to eliminate the Sergeant positions, the intervening events demonstrate Chief Rifenberick's growing hostility toward and distrust of plaintiffs.  The Personnel Committee based its decision to eliminate the Sergeant positions entirely on information from Chief Rifenberick.  Moreover, on the same day City Administrator Johnson informed the union of the City's intention to eliminate the Sergeant positions, Chief Rifenberick completed his second evaluation of Rick, rating his performance between "meets" and "below" expectations on the evaluation form.  This second evaluation would provide further justification for Chief Rifenberick's recommendation that the City terminate Rick.  A reasonable jury could conclude that Chief Rifenberick's conduct between the time of the protected activity and the time of the adverse employment actions creates a sufficient temporal connection to establish causation.

A reasonable jury could also conclude that Chief Rifenberick had particular reason to target plaintiffs for their protected activities, even though other officers also engaged in

similar protected activities.  At the time of the Shellum investigation, the Pearsons were second and third in the Department's chain of command.  A reasonable jury could conclude that Chief Rifenberick took a particular interest in their testimony and sought to obtain favorable testimony from them that would insulate him from criticisms from subordinate officers.  Chief Rifenberick was also aware of Mark Pearson's concerns relating to the Safe 'n' Sober grant, and therefore Chief Rifenberick could have identified Mark Pearson as a potential source of incriminating testimony in the Shellum investigation.  A reasonable jury could also conclude that Chief Rifenberick felt particularly betrayed by Rick, who had previously assisted him in compiling documentation against Officer Sherburne, one of the officers Chief Rifenberick perceived to be a source of complaints within the Department.  Chief Rifenberick had also been on friendly social terms with the three plaintiffs before the Shellum investigation, and therefore a reasonable jury could conclude that Chief Rifenberick singled the three of them out for adverse employment actions because he perceived them as having betrayed his friendship by cooperating with the investigation and refusing to try to shape the outcome of the investigation in Chief Rifenberick's favor.

Defendants have offered legitimate, non-retaliatory reasons for the adverse employment actions.  Defendants argue that the City eliminated the Sergeant positions because the City Council determined that "having Sergeants' [sic] was an ineffective and unproductive management structure."  They further argue that the City discharged Andrew Rick because Chief Rifenberick determined that Rick "failed to perform in a

manner reasonably expected of a City patrol officer."  (Mem. in Supp. of Defs.' Mot. for Summ. J. at 36, Docket No. 24.)

Plaintiffs, in turn, have come forward with evidence from which a reasonable jury could conclude that defendants' proffered reasons for the adverse employment actions are merely a pretext for retaliation.[4]  With respect to the elimination of the Sergeant positions, City Administrator Johnson testified that the "restructuring" was not prompted by performance issues or financial concerns.  Chief Rifenberick, however, singled out the Pearsons, as opposed to the general Sergeant-Chief structure, as the reason for the restructuring.  He testified that the restructuring was needed because he had concerns about "[t]he communication between **the Pearsons** and [him]self and how they were approaching staff and their duties."  He believed that the Sergeant position was ineffective because "of the manner in which **the Pearsons** were communicating their role."  Moreover, at approximately the same time that the City was considering eliminating the Sergeant positions, it was also considering creating a new supervisory position similar to a Sergeant position.  A reasonable jury could conclude that the City's alleged need to restructure the Department was merely pretext for retaliation against the Pearsons.

With respect to the termination of Andrew Rick, Chief Rifenberick's initial enthusiasm about Rick, prompting him to encourage the City Council to circumvent its usual hiring process, stands in stark contrast with the unusual timing and content of Chief

---

[4] The City does not address these pretext arguments.  (*See* Mem. in Support of Defendants' Motion for Summary Judgment at 36-37, Docket No. 24; Reply Mem., Docket No. 38.)

Rifenberick's evaluations of Rick after the investigation began.[5] A reasonable jury could conclude that the unusual three-month evaluation and the subsequent six-month evaluation, paired with no opportunities for Rick to receive training to correct any performance concerns, demonstrate that Rick's allegedly unsatisfactory job performance was simply a pretext for retaliation.

In summary, there is a genuine issue of material fact as to whether there was a causal connection between the protected activities and the adverse employment actions, and as to whether the City's proffered non-retaliatory reasons for the adverse employment actions were merely a pretext for retaliation. Therefore, defendants are not entitled to summary judgment on the FLSA retaliation claim.

### B.    Minnesota Whistleblower Act (Count 1)

Plaintiffs also allege that Chief Rifenberick and the City violated the Minnesota Whistleblower Act, Minn. Stat. §§ 181.931, *et seq.* The Pearsons allege that they reported various suspected violations of the law and suffered retaliation as a result. All three plaintiffs allege that they cooperated with the City's investigation of claims that Chief Rifenberick had violated the FLSA and that defendants repeatedly retaliated against them because of their cooperation with the investigation.

---

[5] The Court notes that plaintiffs' counsel did not expressly address pretext with respect to Andrew Rick's claims. (*See* Docket No. 27 at 34.) The Court expresses its concern with the apparent lack of evidence on the issue of pretext for Rick's termination. Nonetheless, in light of the timing of the apparently unprecedented three-month performance review, which allegedly formed the basis for Rick's termination, the Court concludes that a reasonable jury could conclude that Rick's allegedly unsatisfactory job performance was a pretext for retaliation. The Court notes, however, that the evidence of pretext is relatively weak at this stage, and that at trial plaintiffs will be obligated to come forward with evidence of pretext.

The Minnesota Whistleblower Act prohibits an employer from discharging, disciplining, threatening, otherwise discriminating against, or penalizing an employee regarding the employee's compensation, terms, conditions, or privileges of employment because the employee "in good faith, reports a violation or suspected violation of any federal or state law . . . to an employer or to any governmental body."  Minn. Stat. § 181.932 subd. 1(1).  It also prohibits adverse employment actions when "the employee is requested by a public body or office to participate in an investigation, hearing, [or] inquiry."  Minn. Stat. § 181.932 subd. 1(2).  Minnesota applies the *McDonnell Douglas* analysis to claims brought under the Minnesota Whistleblower Act.  *Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 834 (8th Cir. 2007); *Calvit v. Minneapolis Pub. Schs.*, 122 F.3d 1112, 1118 (8th Cir. 1997); *Anderson v. Hunter, Keith, Marshall & Co., Inc.*, 417 N.W.2d 619, 624-25 (Minn. 1988).

Defendants concede that plaintiffs' participation in the Shellum investigation was protected conduct under the Minnesota Whistleblower Act,[6] and that at least some of the City's conduct, such as eliminating the Sergeant positions and terminating Rick, qualifies as "adverse action."  (*See* Mem. in Supp. of Defs.' Mot. for Summ. J. at 24-25 & n.5, Docket No. 24.)  Defendants argue, however, that the causation element is not satisfied because there is no temporal or substantive connection between plaintiffs' protected conduct and the subsequent adverse employment actions.  As described in Part II.A, Chief Rifenberick's conduct between the time of the investigation and the time of the

---

[6] The Pearsons do not argue at summary judgment that their reports of sexual harassment are protected conduct.  (*See* Plaintiffs' Mem. of Law in Opposition to Defendants' Motion for Summary Judgment at 20-34, Docket No. 27.)

adverse employment actions would allow a reasonable jury to conclude that there was a causal connection between the protected activity and the adverse actions. Moreover, as described above, a reasonable jury could conclude that defendants' proffered reasons for the adverse actions were merely pretexts for retaliation. Therefore, defendants are not entitled to summary judgment on the Minnesota Whistleblower Act claim.

## III.    PROCEDURAL DUE PROCESS (Count 2)

The Pearsons allege that defendants deprived them of property rights without due process of law, in violation of the Fourteenth Amendment. *See* 42 U.S.C. § 1983.

Defendants argue, in part, that even if the Pearsons had a protected property interest at stake in the decision to eliminate the Sergeant positions, defendants satisfied all due process requirements. The Court concludes that there is no genuine issue of material fact with respect to the due process claims, and therefore defendants are entitled to judgment as a matter of law on Count 2.

A public employee with a protected property interest in continued employment is entitled to pre-deprivation notice and an opportunity to respond prior to the proposed action, and are also entitled to post-deprivation administrative procedures for review of the decision. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-48 (1985). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899-900 (8th Cir. 1994).

The "pre-termination hearing need not be elaborate.  To the contrary, all that is required is that the employee have notice of the charges . . . , an explanation of the employer's evidence, and an opportunity [for the employee] to present his side of the story."  *Winskowski v. City of Stephen*, 442 F.3d 1109, 1110 (8th Cir. 2006) (internal quotation marks and citations omitted; alterations in original).   Here, the Pearsons received notice of the City Council's intention to eliminate the Sergeant positions before the City Council's vote.   The union representative explained why the City intended to eliminate the positions.   The Pearsons had the opportunity to attend the City Council meeting to present their side of the story.   Although plaintiffs contend that there is a factual dispute regarding whether the Pearsons were actually present at the meeting, (Plaintiffs' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 38, Docket No. 27), they do not dispute that the Pearsons had the **opportunity** to attend and present their side of the story.   The fact that the Pearsons elected not to present their side of the story does not implicate due process.

The Pearsons waived their due process claim by failing to exercise the opportunity to request post-deprivation administrative review.   The City's Personnel Policy has a grievance procedure, (Personnel Policy for the City of Big Lake § 9, Elwood Aff. Ex. 7, Docket No. 34), but the Pearsons did not grieve the elimination of the Sergeant positions and do not argue that the post-deprivation grievance procedures are constitutionally inadequate.   They argue that "the union refused to pursue a grievance on the Pearsons' behalf," (Plaintiffs' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 38, Docket No. 27), but nothing in the Personnel Policy prohibits an individual employee from

initiating a grievance independent of the union.  "[A] government employee cannot recover for a due process violation where the employee simply failed to avail himself of the post-termination process that was available." *Winskowski*, 442 F.3d at 1110; *see also Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 904 (8th Cir. 2000) ("[A]n employee waives a procedural due process claim by refusing to participate in post-termination administrative or grievance procedures made available by the state.").

Because the City provided adequate pre-deprivation notice and a pre-deprivation opportunity for the Pearsons to present their side of the story, and because the Pearsons waived their due process claim by failing to make use of the grievance procedure for post-deprivation administrative review, defendants are entitled to summary judgment on the Pearsons' due process claim.

## IV.    FIRST AMENDMENT CLAIMS (Counts 3 and 4)

Plaintiffs allege that Chief Rifenberick deprived them of their First Amendment free speech rights by retaliating against them for testifying in the Shellum investigation. The Pearsons also allege a First Amendment violation for retaliation in response to their expression of opposition to Chief Rifenberick's distribution of allegedly pornographic emails.[7]

---

[7] The complaint also alleges that Chief Rifenberick deprived Andrew Rick of his First Amendment free association rights by retaliating against him for publicly associating with the Pearsons. Plaintiffs appear to have abandoned this freedom of association argument. (*See* Mem. in Opp'n at 39-41, Docket No. 27.)  Moreover, plaintiffs have failed to show that Rick's relationship with the Pearsons is one of the "certain intimate human relationships" that warrants protection under the freedom of association clause. *See Royer v. City of Oak Grove*, 374 F.3d 685, 688 (8th Cir. 2004); *see also Wingate v. Gage County Sch. Dist.*, 528 F.3d 1074, 1081 (8th Cir. 2008); *Doe v. Miller*, 405 F.3d 700, 709-10 (8th Cir. 2005).

To establish a prima facie case of First Amendment retaliation, plaintiffs must show that "(1) [they] engaged in activity protected by the [F]irst [A]mendment; (2) the defendant[s] took an adverse employment action against [them]; and (3) the protected conduct was a substantial or motivating factor in the defendant[s'] decision to take the adverse employment action." *Davison v. City of Minneapolis*, 490 F.3d 648, 655 (8th Cir. 2007). If plaintiffs make this showing, "the burden shifts to the defendant[s] to demonstrate that the same employment action would have been taken in the absence of the protected activity." *Id.*

Here, the first factor is dispositive. "Typically, in determining whether speech is constitutionally protected, as a threshold matter we would first consider whether the employee spoke as a citizen and on a matter of public concern." *Id.* "Speech is protected if it relates to a matter of public concern," but not if it is primarily motivated by private interests. *Altonen v. City of Minneapolis*, 487 F.3d 554, 559 (8th Cir. 2007); *see also McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 866 (8th Cir. 2009). Where, as here, an employee's speech "relates both to an employee's private interests as well as matters of public concern, the speech is protected if it is primarily motivated by public concern." *McCullough*, 559 F.3d at 866. The Court therefore must focus on the speaker's motivation for speaking. "Motivation is gauged by evaluating the speech's content, form, and context." *Id.* The mere fact that the content of the speech is something in which the public might have a great interest is "of little moment," because the focus of the analysis is on the speaker's motivation. *Id.*

Because the speech was not primarily motivated by public concern, it was not constitutionally protected and therefore defendants are entitled to summary judgment on the First Amendment claims. Plaintiffs have failed to identify any evidence to show that plaintiffs were primarily motivated by public concern when they spoke to Shellum. Rather, the evidence demonstrates that plaintiffs were acting in their capacity as employees, not as citizens, and were complying with City Administrator Johnson's directive to cooperate with the investigation. For example, Andrew Rick testified that when members of the public questioned him about the investigation, he responded that he could not discuss confidential police business. Mark Pearson, who had been concerned about Chief Rifenberick's administration of the Safe 'n' Sober grant long before the Shellum investigation, conceded that his primary motivation for raising his concerns was that his name was on the grant and he did not want to be implicated in any wrongdoing. He testified that he was "basically covering [his] own butt" in reporting his concerns to City Administrator Johnson. Because no reasonable jury could conclude that plaintiffs were primarily motivated by public concern when they spoke to Shellum, defendants are entitled to judgment as a matter of law on this First Amendment claim.

The Pearsons have also failed to identify any evidence to show that they were primarily motivated by public concern when they reported Chief Rifenberick's distribution of the allegedly pornographic emails. Todd Pearson testified that he was concerned about being disciplined if he were to open the email attachments at work. He testified that he was reporting the emails because he believed they violated the Department's sexual harassment policy. He was aware that the policy required

immediate reporting, yet he waited to report the emails until more than one year after he received them and several months after he finished his probationary status.  In light of these circumstances, no reasonable jury could conclude that the Pearsons were primarily motivated by public concern when they reported the emails.  At most, they were simply attempting to comply with the Department's sexual harassment policy.

## V.    DEFAMATION (Count 6)

The Pearsons allege that Chief Rifenberick communicated to third parties false and defamatory statements about the Pearsons in their professional capacity, and that Chief Rifenberick made and published those statements with knowledge of their falsity.

"A statement is defamatory if it (1) has been communicated to a third party; (2) is false; and (3) tends to harm the individual's reputation and lowers him or her in the community's estimation."  *Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995).  "[N]umerous courts, including the Minnesota Supreme Court, have held that expressions of opinion, even if defamatory, are constitutionally protected."  *Lund v. Chi. & Nw. Transp. Co.*, 467 N.W.2d 366, 368 (Minn. Ct. App. 1991).  Minnesota courts have recognized that the dichotomy between fact and opinion is artificial, but they recognize the utility of a four-factor test to assess whether a statement is an actionable factual statement or a protected opinion statement.  *McGrath v. TCF Bank Sav., FSB*, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993).  The test "examines the precision and specificity of the statement, its verifiability, and the social, literary and public context in which the statement was made."  *Id.*  "[S]tatements which cannot be reasonably

interpreted as stating actual facts[] are absolutely protected by the First Amendment." *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 94 (Minn. Ct. App. 1991).

The Pearsons identify three allegedly defamatory communications by Chief Rifenberick: a December 3, 2007, interview with a background investigator from the Blaine police department; a statement to the Becker Police Chief that all of Chief Rifenberick's problems had to do with his two former Sergeants; and a statement to the Elk River Police Chief that Mark Pearson had personality conflicts.

Because the alleged statements cannot reasonably be interpreted as stating actual facts, they are absolutely protected by the First Amendment and therefore defendants are entitled to summary judgment on the Pearsons' defamation claim. The Pearsons have failed to identify any statement that Chief Rifenberick made to the Blaine background investigator that is sufficiently precise, specific, and verifiable to amount to an actionable factual statement. They argue that Chief Rifenberick was "uncooperative" and "clearly intended, by refusing to cooperate, to hinder [Todd] Pearson's candidacy." But they have not identified any affirmative statement that was verifiably untrue.

The other allegedly defamatory statements are also protected opinion statements. In *McGrath*, the Minnesota Court of Appeals held that referring to a potential employee as a "troublemaker" is not actionable because the term "lacks precision and specificity. This phrase also fails to suggest verifiable false facts" about the plaintiff and is sufficiently ambiguous that it "prevents any underlying facts from being inferred" from the phrase. 502 N.W.2d at 808. Chief Rifenberick's statement that Mark Person had "personality conflicts" and that all of Chief Rifenberick's problems had to do with the

Pearsons are comparable to the "troublemaker" statement and therefore are protected opinion statements under the First Amendment.

## VI.    TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (Count 7)

The Pearsons allege that Chief Rifenberick repeatedly interfered with prospective employers' attempts to gather information about them, thereby interfering with the Pearsons' prospective business relations.

Under Minnesota law,

One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from the loss of the benefits of the relations, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

*United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn. 1981).  The question of "whether interference is justified is an issue of fact, and the test is what is reasonable conduct under the circumstances."  *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

The parties assume that the defamation claim and the tortious interference claim are co-extensive.  (*See* Docket No. 24 at 41-42; Docket No. 27 at 42.)  In theory, there may be circumstances in which a defamation claim must fail while a tortious interference claim could go forward.  A defendant's intentional and improper conduct that induces a third person not to enter into a contract might not involve defamatory statements.  Here, however, the Pearsons' tortious interference claim hinges on Chief Rifenberick's statements.  Because alleged defamation is "the means used to interfere with . . . the

business relationships," the claims are duplicative and the tortious interference claim is properly dismissed.  *Wild v. Rarig*, 234 N.W.2d 775, 793 (Minn. 1975).

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the submissions of the parties, the arguments of counsel, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment [Docket No. 23], is **GRANTED in part** and **DENIED in part** as follows:

1.     Defendants' motion as to plaintiffs' FLSA retaliation and Minnesota Whistleblower Act claims (Counts 1 and 5) is **DENIED**.

2.     Defendants' motion as to plaintiffs' procedural due process, First Amendment, defamation, and tortious interference claims (Counts 2, 3, 4, 6, and 7), is **GRANTED**.  Counts 2, 3, 4, 6, and 7 are **DISMISSED WITH PREJUDICE**.


DATED:  February 25, 2010          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                              United States District Judge